## Case No. 6,994.

### IASIGI et al. v. BROWN et al.

[16 Law Rep. 568.]

Circuit Court, D. Massachusetts. Oct. Term, 1853.[1]

REPRESENTATIONS OF CREDIT, &c. OF THIRD PERSON—ACTIONS ON—CONFIDENTIAL LETTER.

1. A person who receives a letter marked "Confidential," has prima facie no authority to exhibit it to any third person; and if so exhibited, no action can be ·sustained by such third person on account of any representations contained in the letter, as to the credit, &c., of another party, without other evidence to show authority from the writer to exhibit the letter. [See note at end of case.]

2. As to evidence upon which a jury would not be warranted in finding such authority.

This was an action on the case brought by Messrs [Joseph] Iasigi and Goddard, of Boston, against Mr. James Brown, of New York. the senior member of the firm of Brown, Bro's and Co., bankers, in which the plaintiffs alleged that Mr. Brown had made certain false and fraudulent representations to them respecting the solvency of Messrs. Thompson & Co., and Orrin Thompson, of New York, and two factories in Connecticut, known as the Thompsonville and Tariffville Manufacturing Companies, by means of which the plaintiffs were induced to sell wool to a large amount (about $25,000) to these parties on credit, which sum the plaintiffs wholly lost by reason of the subsequent failure of the Messrs. Thompson and the factories. The alleged false representations were contained in a letter addressed by Mr. Brown to Mr. Thomas B. Curtis, the agent and correspondent of the defendant's house in Boston, which the plaintiffs averred the defendant intended should be exhibited to them for the purpose of inducing them to give a false credit to the said parties. The defendant contended that his letter was written in entire good faith, was addressed to his agent as a confidential letter, and that Mr. Curtis had no authority to exhibit, or the plaintiffs to read it. The evidence upon this point, which was the one on which the case was decided, was in substance as follows:

T. B. Curtis, called by the plaintiffs, testified that in April, 1851, he was the agent of the defendant's firm; that Iasigi came to him, stating that he had a large amount of notes of certain factories in Connecticut, indorsed by Orrin Thompson; that Austin & Spicer, in New York, had recently failed, by

---

which he thought the factories or Thompson or both, would lose money, and that he felt anxious as to the fate of the paper he held, that Iasigi said Brown was a friend of Thompson, and he had himself heavy dealings with him, and wished witness to write to the defendant and ask him about the standing of Thompson and his property; that witness accordingly wrote the following letter to Mr. Brown:

"Boston, April 5, 1851. James Brown, Esq. —Dear Sir,—I have your note of yesterday, but have had scarcely a moment to peruse it this morning. My object at the present moment is to ask your opinion as to any possibility of loss by selling largely to the Thompsonville Co. or Orrin Thompson. Whatever that opinion may be, it will be discreetly used by myself. I also want your views as to the unlooked for high exchange on England. To what cause is it attributable? Has the influence of gold from California any thing to do with it? Is the exchange likely to be lower? I am delighted with the success of the Baltic. Yours faithfully, Thomas B. Curtis.

"Please give me a line about the Thompson concern on Monday."

—A reply to which was received by him. The plaintiffs' counsel asked him to produce the letter. To this he objected, on the ground that it was confidential. The plaintiffs' counsel asked how he knew it was confidential, to which he answered that all he knew was by the writing itself and the circumstances; that all he said was that it was a confidential letter; that when he wrote to Mr. Brown he did not let him know the information was for any one else than himself. But the letter, of which the following is a copy, was admitted:

"Confidential. New York, 7 April, '51. T. B. Curtis, Esq.—Dear Sir,—With respect to Thompson & Co., and Orrin Thompson, I have to say that our house has done business with them for some twenty years or more; they have always met their engagements promptly, and we feel are men of strict integrity. They have unquestionably laid out too much money in the Tariffville Manufacturing Company, and the Thompsonville Carpet Manufacturing Company, and my house has been for years in the habit of loaning them either paper or money to a considerable extent on security. On the failure of Austin & Spicer, they were unfortunately on their paper (received for sales of carpets for $183,000); this threw suddenly so heavy a burden on Thompson & Co., that Messrs. Hicks & Co. and ourselves looked into their affairs; and feeling that they had an abundance to pay every one, and have a handsome sum left if they continued their business, we jointly advanced the money to pay their indorsements as they came round, for which advances we have security. In order, however, to relieve them from the necessity of borrowing and needing more cash capital, to carry on the business comfortably, both the companies alluded to owing Messrs. Thompson & Co. each about $375,000, making together $750,000, executed a mortgage to John H. Hicks, W. S. Wetmore, and James Brown, for $750,000, to secure the payment of those bonds, which are payable in six, eight, and ten years. A gentleman goes over to Europe this month to negotiate these bonds, which he feels confident of doing on favorable terms. The negotiation of these bonds and the securities held would pay off all the advances made by ourselves, Messrs. Hicks & Co. and W. S. Wetmore, who also made them some advances. From Mr. Thompson's statement of the business of the factory they are doing a good, nay a very profitable business, and I feel that in making sales to them now, no more than the ordinary business risk would be run. If the bonds are negotiated, which is confidently expected, they would be enabled to conduct their business with more facility and comfort than they have ever yet done, and as I will recommend brother William to take from 60 to $100,000 for himself and for me, at whatever rate they are negotiated at, the confidence shown will probably help the negotiation. Messrs. Hicks will also take some of them. Since the failure, Thompson & Co. have laid their hands on Austin & Spicer's property to the extent of $50,000, reducing the risk to $123,000, and out of this they will get a dividend. As Mr. Orrin Thompson considers himself fully worth $400,000, any loss that can now occur by Austin & Spicer does not hurt him much. All they want is the negotiation of the bonds to make them move on with perfect comfort. I have no doubt the influx of California gold has been one cause of increased importations, and the gold must go to pay for them, &c. &c. (Signed) Yours truly, James Brown."

"The answer was due," Mr. Curtis stated, "on the 8th April, and on that day Mr. Iasigi came to me and asked if I had a reply. I told him I had a confidential answer. He begged me to let him see it, and persuaded me to do so, and I showed it to him. My reply to him was that I had a confidential answer; he said he hoped I would let him see it, and I showed it to him. There was no one with him at the time. * * * He then asked me to let him take the letter to show it to his friend Mr. S., with whom he said he always advised. I again said the letter was confidential, and that I could not suffer it to go out of my office. He then said, 'Will you let Mr. S. see it here?' repeating that he always advised with S. on matters of importance, and he wanted him to see it. On this solicitation I consented, and S. came with Iasigi and read the letter. * * * We were neighbors and friends. I was led to ask this information, and to communicate the result to him, in consequence of the friendly relations that had long subsisted between us; and further, because I

thought it would tend to relieve Mr. I.'s mind, and not with any view to future sales. If it had not been for that state of facts I should not have shown him the letter. * * * Mr. Brown never authorized me to exhibit the letter to any one. I don't know when Mr. Brown first knew that the letter had been shown to any body. Don't know that he knew it till after the failure of Thompson & Co."

In the month of May Mr. Iasigi relying, as he claimed and offered to prove, upon these letters, made sales to the factories for notes indorsed by Thompson to the amount of about $25,000, which he lost by their failure in the autumn of 1851. In June Mr. Curtis wrote the following letter to Brown, Brothers & Co., in relation to the Thompsonville factory, at the request of Mr. Patrick Grant, who had been applied to, to sell wool to that company, and had consulted Iasigi:

"Boston, 26th June, 1851. Messrs. Brown, Brothers & Co., of New York—Gentlemen: Your favor of the 25th inst. is received, and your remarks have my attention. Nothing in my letters from Liverpool to report. A friend of ours desires me to inform him how far it would be satisfactory to me (you) to have him sell to the Thompsonville Co.? I replied that I believed you thought favorably of the concern. Now I wish to know what your present feelings are in respect to that concern? There being several among my friends here who have heretofore sold them wool and wish to continue to do so. Yours faithfully, (Signed) Thos. B. Curtis."

To which the following reply was received:

"New York, 27th June, 1851. Thomas B. Curtis, Esq., Boston—Dear Sir: We are in receipt of yours 26th inst.; contents noted. We continue to have a favorable opinion of the concern you allude to. No change in our views about exchange. We are your friends. (Signed) Brown, Bro's & Co."

R. F. Wyman testified that in April, 1851, he applied to Mr. Curtis in regard to this company. Curtis said he would make inquiries, and told him afterwards that he had made them, and they were considered good. Mr. Grant testified, that after the failure of the parties in Connecticut he went to New York, where Iasigi and himself had an interview with Messrs. James and Stewart Brown, in which the letters of April 7th and June 27th were the basis of conversation. Mr. James Brown did not say that the last was written without his knowledge or approbation. Mr. Grant said he went to see as to the failure of the Thompsonville Co., so far as he was concerned, and to show, as he hoped to do, to Brown, Brothers & Co., that there was a moral responsibility on their part to respond to these notes. The April letter was very fully discussed. Mr. Iasigi stated that he had applied to Curtis to know with respect to the Thompsonville and Tariffville Co's, and Orrin Thompson, to know what their credit was, and whether it would be safe to sell to them. He connected Grant with the April letter, although, as Grant now testified, he had nothing to do with that, but that he did not then state that to Mr. Brown. Iasigi then alluded to the letter written for Grant. Copies of the letters were there, but Mr. Grant thought they were not produced. Both were distinctly referred to, distinctly recognized and commented on, and their various parts distinctly discussed. Iasigi commented on his own and Grant's transaction, and said they had sold on the faith of these letters; and as all the property of the companies and Thompson had apparently been attached by Brown, Brothers & Co., they (the claimants) ought, in a moral point of view as to responsibility, to share part and parcel with those who had attached. Mr. Brown said the letter of April 7th was a guarded one, and that as to the second letter, that was nothing but a statement that "we continue to have a favorable opinion of the concerns." That the connection of his firm with Thompson has been of a long date; that they had had a great number of transactions together, and that at the time the April letter was written, that they had intended to carry Mr. T. through, but that Thompson had deceived them. He repeated several times that this was a guarded letter; and as it was written in entire good faith, and as they had lost much more than Iasigi and the others subsequently to the writing of the letter, they did not see how there could be any responsibility resting on them. Stewart Brown said, "If you had called on us, gentlemen, and conversed with us instead of writing, you would not have sold this wool." That when the letters were written they intended to carry Thompson & Co. through; as they found they could not, the letters were guarded; that the parties ought not to have sold on them. He conveyed the meaning, that, if they had called personally, matters would have been explained more fully, and they would not have sold. The letters were written under the feeling that these people were not very strong. That inference was very plain, the witness said, from what he stated; and also, that he meant them to understand that the April letter was very guarded, and that they ought not to have sold on the faith of it. The moral responsibility of the firm was the particular topic when they said the letters were guarded. The principal conversation was on their moral responsibility as based on the two letters. The claim against them was put on the contents of the letters; and the accompanying facts that they had all the property. Mr. G. also said that no suggestion was made by any one at the interview, that the letter was confidential, or had been improperly shown.

The plaintiffs also offered to prove that certain statements in the letter of April 7th, material to show the property and credit of said Thompsonville Co., said Tariffville Co., and of Thompson, and the safety and expediency of selling them goods on credit, and to influence the judgment of one reading the letter in regard to such sale, were false, and known to the defendant to be so when the letter was written, and were then known to him to be material to show the credit and property of those parties, and the safety and expediency of selling to them on credit. Also, that in said letter the defendant did intentionally suppress and conceal facts which he knew and knew to be material to show their property and credit, and the safety and expediency of selling as aforesaid, and which would materially qualify and change the statements in the letter, and make them in material respects less calculated to influence the judgment in favor of crediting them; and that within thirty days before April 7th, the defendant alone and jointly with one Hicks, had taken conveyances in mortgage, or absolutely, of all Thompson's property, real and personal, with some small exceptions, to the amount of $188,000, as security for the debts and liabilities of Thompson & Co. to defendant's house and to said Hicks, amounting to over $509,000; also that defendant was largely interested, pecuniarily, to sustain the credit of Thompson and the factories, and to induce extensive sales to them on credit. And this evidence was offered generally in support of the action, and also to show that the defendant wrote the letter with the fraudulent intent stated in the declaration, and that it should be shown to other persons than Mr. Curtis, to induce them to sell to those parties on credit. And the plaintiff proved that he made the sales stated in his declaration, relying on and trusting to and in consequence of the letter of April 7th.

A great deal of testimony was put in, and the foregoing is somewhat condensed and transposed; but taken in connection with the opinion of the court, it is hoped that enough has been stated to present with distinctness the question of law raised in the case. Nor is it deemed necessary to give at length such portions of the evidence as appear from the opinion of the court, or were excluded upon any general principle which indicates their nature. The defendant contended that upon the plaintiffs' own evidence, which they had introduced and offered to introduce, the jury would not be warranted in finding that defendant ever gave any authority to Mr. Curtis to exhibit his letters of April 7th to the plaintiffs, or that he intended that it should be so exhibited to or read by the plaintiffs, or any other person than Mr. Curtis himself; that the jury consequently could not find that the defendant had ever made any representation to the plaintiffs, and therefore that the action could not be maintained.[2]

R. Choate and S. Bartlett, for plaintiffs.
C. G. Loring, and E. Merwin, for defendants.

SPRAGUE, District Judge. The questions presented in this case are important, and I am not surprised that the ablest counsel should differ widely respecting them. I have given to them all the consideration which the time has allowed during the progress of a jury trial, and will now state the conclusion to which I have arrived, and the reasons upon which it is founded. In the present position of the case, the question is first, what the jury would be authorized to find, by the evidence, as matter of fact, and secondly, whether the facts they would be authorized to find would be sufficient to sustain the action. And first: The action is founded entirely on the letter of the 7th of April, and the material question is, as to the authority of Mr. Curtis to exhibit it. It is not contended that Mr. Curtis did not act with entire good faith to the plaintiffs or other third parties. There is nothing in the evidence to warrant the jury in finding the contrary, for this rests entirely upon his testimony; and there is no evidence there certainly, that he did not act in entire good faith to the plaintiffs. The question then is this, whether Mr. Curtis did, in fact, have authority to exhibit this letter to the plaintiffs. It is admitted by the counsel that if the jury could find that he had, the cause must be put to them, and on the other hand, if the jury must find that he had no authority, then there was no ground to sustain this action. So, then, the inquiry really is, whether, upon the evidence introduced and offered, the jury could find, agreeably to principles of law, that Mr. Curtis had authority to exhibit the letter. And the first remark is, that all the authority conveyed to Mr. Curtis for the exhibition of the letter, is the letter itself. There is no evidence of any personal communication between Mr. Curtis and the defendant, or with another person as defendant's agent, or by any other means than the letter itself. And the question is, what authority did that letter give him to exhibit it? It is a question of the construction of a written instrument to be aided, undoubtedly, by surrounding circumstances; but the question is this, whether the letter, read by the light of all the surrounding circumstances, conveyed to Mr.

---

[2] It is proper to state in justice to the defendant, that while relying for the present upon the ground above stated, he alleged that he was fully prepared to prove that the letter was written in good faith by him, and that it was a candid statement of all the facts affecting the credit of these parties known to him at the time, and that he, relying upon their solvency, has made advances to them to a very large amount after writing the letter, which he lost by their failure.

Curtis any authority for its exhibition to another party. In the first place, look at the letter. And here as to the province, respectively of the court and the jury. It is equally the duty of the court not to withdraw from the jury any thing proper for their determination; and, on the other hand, not to throw upon them the responsibility of a question which it is the duty of the court to decide.

The general rule of law is—that written instruments are to be construed by the court and not by the jury. This is a written paper, and, by the general rule, to be decided upon by the court. But there may be extrinsic circumstances to be taken into view, in construing all such documents; there may be technical terms and expressions used by one or another class of persons, intelligible to such class, though perhaps not generally. In such case the facts bearing upon the construction are matters to be ascertained by a jury. But when there are no such extrinsic facts, or no such technical terms, then it becomes the duty of the court peremptorily to decide as to the meaning of the writing—its construction and effect. Questions may sometimes arise as to the mercantile or commercial meaning attached to terms of trade. But here there is no evidence whatever of any meaning of the words, different from the ordinary, usual one known to the community and presumed to be known to the court. It is argued for the plaintiffs that the term confidential, as between bankers, merchants, and the like, has a meaning different from the ordinary one, but no evidence has been offered to show that such is the case. There is evidence offered of extrinsic circumstances going to prove, as the plaintiffs aver, that Mr. Curtis had authority to exhibit this letter, and this will be examined hereafter. But let us, in the first place, proceed to consider the letter itself. It must be taken in connection with that of the 5th of April from Mr. Curtis. That, also, is a written paper, and its construction belongs to the court and not to the jury. In the letter of the 5th, Mr. Curtis asks as the defendant's opinion of the danger or risk of selling largely to those parties, and then adds, that whatever that opinion may be "it will be discreetly used by myself." In answer, the defendant immediately writes, beginning his letter with the word "confidential." He then goes into a statement of the relations and dealings between himself and the said concerns; states certain facts; and expresses an opinion as to their ability to pay, and the danger of loss by trusting them.

Now, the question before the court, in looking at the letters, is as to the force and effect of the word "confidential," in the letter of the 7th of April, as taken in connection with the first letter of the 5th of April, and the surrounding circumstances. It is written immediately after in answer to the inquiry of Mr. Curtis, and it will be observed that Mr. Curtis promises that whatever may be the opinion of Mr. Brown, it will be "discreetly" used by himself. This, if the word "confidential" were omitted from the reply, would leave the matter to Mr. Curtis's discretion, and it is argued that the use of that term does not necessarily restrict the letter to Mr. Curtis's own use. If it (the word "confidential") were left out, I do not think the letter would be restricted to Mr. Curtis's own private business, but the letter would be intended to be used by him discreetly in relation to questions regarding the solvency of the concerns spoken of. But the defendant does not content himself merely with the promise of Mr. Curtis to use the defendant's opinion discreetly, but superadds a restriction of his own,—he marks his letter "confidential," and the question is, what is the meaning of that word? I apprehend that it cannot be, as the learned counsel for the plaintiffs have contended, that it means that Mr. Curtis is to be discreet as to whom he shall exhibit the letter, for the defendant had that promise in the letter from Mr. Curtis; he was not content with that promise, but marks his reply "confidential." And now can it be said that a person receiving a communication bearing "confidential" on the face of it, is at liberty, at his own discretion, to show it to everybody or anybody? I think not. I think it would be a violation of the whole rule of correspondence and of the plain meaning of the term "confidential." The argument is, that it was intended to leave entirely to Mr. Curtis's discretion the exhibition or communication of the letter, or its contents. But that is the very thing which it seems to me the defendant intended expressly to prevent. He was not willing to leave it to his agent's discretion, but meant distinctly to restrain him as to the use to be made of his communication. The contents of the letter would not give a different force and effect to the word from that, because they give a detail, at great length, of the affairs of Thompson & Co., of their pecuniary arrangements, of their attempts to sustain their credit by the negotiation of bonds in England, and an opinion that T. & Co. had invested too much money in the factories, &c. These details, if they do not strengthen, certainly do not impair the effect and force of the word "confidential." Looking at the letters themselves, therefore, I cannot see on the face of them anything to authorize Mr. Curtis to exhibit the letter of the 7th April to Mr. Iasigi or others. And here be it remembered, that Mr. Brown did not know that Mr. Curtis wrote his letter at the request of the plaintiffs or any other party.

Now looking at the extrinsic circumstances or evidence of other facts, let us see if either court or jury can be authorized by them to give a different construction to the letter. The first evidence is that of Mr. Curtis, the first witness called for the plaintiffs. What

are the jury authorized to find from any facts he has testified to? His testimony in every part of it goes to show that he had no authority out of the letter itself, to exhibit it. He negatives the contrary altogether. He states that he considered it confidential, and not to be communicated. But if he had stated the reverse, his considering that he had the authority would not make it so. He says, that at the request of Mr. Iasigi he exhibited the letter to him, stating to him distinctly that it was a confidential letter. It has been contended in argument that the jury would be authorized not to believe this, because in the former deposition of Mr. Curtis he makes no mention of such statement. Perhaps this is not a material fact to inquire into now. But the moment the plaintiff put his eye upon the letter he saw at once that it was confidential on the face of it. He must have seen it, in the very first line. On Mr. Curtis's testimony, therefore, there is nothing to control the force and effect of the letter itself—as claiming to be confidential. The next evidence is that given by Mr. Grant, and here the same remarks apply. The jury have authority to find every thing he states as to the interview to be true. They may find every thing for the plaintiffs that the witness testifies to, but the court must decide what would be the force and effect of such facts. Now on his evidence it might be found that Mr. Iasigi, Mr. Grant, and Mr. Kendall, all creditors of Thompson & Co. or the factories, called on the defendant in New York, stating through Mr. Iasigi, that they had sold their merchandise on the faith of the letter of the 7th of April, and had come to claim from the defendant, a participation in the effects of the debtors, on account of the moral obligation the defendant was under, from his position with regard to all parties, to allow them to come in and participate. Thereupon a discussion was had; both letters were spoken of and referred to. Copies of the letters were in the possession of these gentlemen.—Grant swears that he had a copy,—and they must also be presumed to be known to the defendant, for they were alluded to by all parties, by Brown, the defendant, and by his partner, as well as by Iasigi and the others.

Now as to what was said or omitted to be said in this interview. It is argued for the plaintiffs, that the omission to claim that the letter of the 7th of April was confidential, and his silence on that subject was, in effect, an admission by the defendant that it was not confidential, and may be so taken by the jury. Let us look at that. The claim then made was only of a moral obligation—and the only expression of the defendant's relied on by the plaintiffs is his statement that the letter was a guarded one; the question of confidence was not mooted—not alluded to at all—and the question for consideration is, whether, if the defendant in conversation omits to state that the letter

contains some thing which we find in it, that is an admission that the letter does not contain it; or, in other words, if, in a conversation held in October upon a letter written in the preceding April, the party omits to state that it contained a certain statement, he there by intended to convey that it did not contain such statement. It seems to me that the ground can not be maintained; that a party, conversing with another who has a copy of the letter in question and knows what it is, cannot, from an omission to cite any particular of that letter, be held to an admission that the letter does not contain such particular. Here was a claim urged upon a moral obligation; and so considering it, defendant might not have thought it necessary to advert to the confidential character of the letter, whereas he might well have done so had it been a question of legal liability. There is a difference between the two; and it may very well be that a party, in a conversation placed distinctly on the one ground should employ different terms from those he would have used, had he been called upon, on another or opposite ground. Taking the conversation as it was, it is in proof that the defendant declared the letter to be a guarded one. Now the plaintiffs contend that the meaning of this is, that the letter was carefully worded and guarded, so as to protect himself (the defendant). The plaintiffs say that the jury are entitled to draw this conclusion. Suppose it to be so; may not the making of the letter confidential have been one of the guards he had reference to in the conversation? May he not have intended it as such? But again, suppose that he was speaking of the contents of the letter. The plaintiffs' argument assumes that a person does not write a guarded letter, meaning and intending it to be a confidential one; but that when one writes a confidential letter, it will be a free statement of facts or opinions inconsistent with the import of the word "guarded." That is, that in this, or a similar case, the very declaration by the writer, that his letter was, or was meant to be a guarded one, overthrows the presumption that it was confidential. This suggestion may be of some force as to mere letters of friendship, but not as to matters of business. I see no inconsistency in declaring the letter to be guarded, and at the same time holding it to be confidential. A principal may be guarded in his statement to his agent and may write cautiously, in order that he may not be misled, but that does not show that it may not be also confidential. We next come to the letters of the 26th and 27th June; they also must be for the construction of the court. It is argued that the letter of June 27th shows of itself, in its language, that the other letter, of April 7th, was not intended to be confidential, but, on the contrary, was meant to be read or shown. Mr. Curtis, in his letter of June 26th, says:—"A

friend of ours desires me to inform him how far it would be satisfactory to me (you) to have him sell to the Thompsonville Co. I replied, that I believed you thought favorably of the concern. Now I wish to know what your present feelings are in respect to that concern; there being several among my friends here who have heretofore sold them wool and wish to continue to do so." In answer to this, the letter of the 27th June, says:—"We continue to have a favorable opinion of the concerns you allude to." Now the question is whether that goes to show that the former letter was not meant to be confidential, and to show that Mr. Curtis had authority to exhibit it. There is no reference whatever in the letter of June to that of April, and can any body say, that this letter of the 27th of June says to Mr. Curtis, that when he received the letter of April 7th he was then at liberty to exhibit it, or is now at liberty to show it? It seems to me the merest conjecture to infer, that Brown, Bro's & Co's letter of June 27th had any reference to that of the 7th April, and still more, that it meant to convey any authority to Mr. Curtis, the agent, to show the first letter. The defendant had no reason whatever to suppose that, in point of fact, up to that time, Mr. Curtis had exhibited the first letter to any body. Nothing was said in any of the correspondence leading to such an inference on his part; and now, on this state of things, can it be, that this letter of the 27th of June gave him authority to exhibit the letter of April 7th? I cannot think that such would be a safe ground of judicial proceeding, in determining the rights of the parties.

I have thus considered all the evidence as yet put in, and now proceed to consider what is proposed to be proved. And this I deem of more importance and force than any thing to which I have before adverted. What is proposed is this—to show that in the letter of the 7th of April there were various statements going to sustain the credit of said parties, which were not true, and that the defendant at the time knew that they were not true, and that he omitted or suppressed facts which he knew to be material; and further, that when doing this, he, as a large creditor, had an interest to sustain the credit of Thompson & Co. and the factories, and to procure for them further credit in the community. From all this, if proved, the court or jury might doubtless infer that it was the intention of the writer to sustain the credit of the Thompsons, and that his letter should in some manner be operative to that end. But in what manner? The counsel for the plaintiffs insist that it must have been by exhibiting the letter to the third persons. Their argument assumes that this is the only mode in which the letter could operate to sustain the credit of the Thompsons. But is it the only mode? Is there not another? less effective indeed in giving a false credit, but

still conducive to that end, and more safe to the writer, and more in accordance with his expressed purpose of withholding his name and shielding himself from responsibility to others. It is to be borne in mind that his letter was not volunteered. It was drawn from him by a direct interrogatory, put by the letter of Mr. Curtis. He was not informed that this was written at the request of any other person, or that Mr. Curtis would be under the necessity of saying to any one, that he had or had not received a communication upon this subject from the defendant. Mr. Curtis put the inquiry as his own, with an assurance that the opinion which might be given in response should be used discreetly by himself. This implied that it would be entirely within his control and discretion. If the defendant had refused to make any answer to Mr. Curtis, that might of itself have been injurious to the credit of the Thompsons. All that the occasion required, so far as he knew, was to satisfy the mind of Mr. Curtis, so that the credit of the concern should not suffer in his mind, or through the opinions that he might express; and this would be accomplished by a confidential letter to Mr. Curtis, stating such facts and opinions as would convince him, and at the same time prohibiting him from giving the name of the writer as his authority. The letter would thus be operative to sustain the credit of the concerns so far as Mr. Curtis should personally have business with them, and so far as he should express his own opinions to others. This was all that there was any apparent occasion for the defendant then to do, and if the statements in the letter were designedly false as the plaintiffs insist, and as we must for the purposes of the present question take them to be, that of itself might be a strong reason, why he should be unwilling that his name should be disclosed, and should prohibit this correspondent from subjecting him to responsibility to others.

Let us here recur to the main question. The court is called upon to give a construction to this letter, and to declare, whether it authorized Mr. Curtis to exhibit it to the plaintiffs. It contains language clearly prohibiting such exhibition. The plaintiffs insist that such prohibition is incompatible with extrinsic facts, and therefore to be disregarded. The burden is upon the plaintiffs to show the incompatibility. This they have not been able to do; on the contrary, it appears that all the facts which could be found by a jury, admit of a fair and rational solution, in perfect harmony with the language of the letter. There is nothing which can authorize the court to annul or disregard the distinct and positive prohibition which it contains. The exhibition of the letter therefore was not authorized by the defendant. Here another question may arise. It may be contended, that although the letter was not intended to be shown, yet that it was intended to give a false credit to the Thompson con-

cerns, by impressing Mr. Curtis with an erroneous opinion, and by his expressing such opinions to mislead others; and that the plaintiffs have in fact been misled, and given credit to their injury. To this it may be answered, in the first place, that although it may have been intended to have given a false credit, and that Mr. Curtis should express his own opinion to that end, yet this was not in fact done, and what was done was not authorized. No one can say that if Mr. Curtis had merely expressed his own opinion, the plaintiffs would have given the credit. When Mr. Iasigi went to Mr. Curtis, it was not for his opinion, but to obtain that of the defendant, because, as is expressly alleged in the declaration, he knew that the defendant was conversant with the Thompson concerns; and the plaintiffs have from the beginning relied solely on the exhibition of the letter, as the ground upon which they made the sales. They did not give credit upon any act authorized by the defendant. Whether if Mr. Curtis had done what he was authorized to do, merely expressed his own opinion, the plaintiffs would have given the credit, is mere matter of speculation and conjecture, which cannot be the basis of a judicial determination. In the second place, by the Revised Statutes of Massachusetts (chapter 74, § 3) it is provided that no person should be liable for any representation of the credit of another, unless such representation shall be in writing, and signed by him, or by some person by him lawfully authorized. Now if the plaintiffs had had only a verbal representation from Mr. Curtis, as the expression of his own opinion, the statute would have interposed an obstacle to the plaintiffs' recovery. The result is, that the evidence which has been introduced and offered is not legally sufficient to maintain this action, and the jury must be instructed to return a verdict for the defendant.

[NOTE. The case was then taken by writ of error to the supreme court, where the judgment was reversed in an opinion by Mr. Justice McLean, who said that it was for the jury to say whether the letter which was marked "Confidential" was intended for the exclusive perusal of the person to whom it was addressed. All facts which conduced to show that defendant acted in bad faith in writing the letter should be considered by the jury. Campbell and Curtis, JJ., dissented. 17 How. (58 U. S.) 183.]